Filed 5/18/16  P. v. Robertson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES ROBERTSON,<br><br>    Defendant and Appellant. | A141587<br><br>(San Francisco County<br> Super. Ct. No. 12005210; 220237) |

This is an appeal from final judgment after a jury convicted defendant Charles Robertson of first degree murder, enhanced for use of a deadly weapon (to wit, a knife). Defendant challenges his conviction on multiple grounds, including that the prosecutor's excusal for cause of an African-American male prospective juror violated his right to a fair and impartial jury, that the trial court prejudicially erred when ruling on the admissibility of character evidence, and that the evidence was insufficient to support conviction for first-degree murder. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 2013, a single-count information was filed charging defendant with first degree murder in violation of Penal Code section 187, subdivision (a), and alleging that he personally used a deadly weapon (to wit, a knife) within the meaning of Penal Code section 12022, subdivision (b)(1).[1]  This information further alleged that defendant

---

[1]     Unless otherwise stated, all statutory citations herein are to the Penal Code.

had a prior felony conviction for firearm possession (§ 1203, subd. (k)), and was on parole at the time of the charged offense (§ 1203.085, subd. (a)).

Trial began in September 2013, at which the following evidence was presented.

## I. The Prosecution's Case.

On January 12, 2012, at around 2:30 a.m., Police Officer Anthony Pedroza, was dispatched to Sixth Street and Stevenson Alley in San Francisco. Upon his arrival, Officer Pedroza found Joseph Minozzi (hereinafter, the victim) lying about ten feet from the curb with a stab wound in his chest. The victim was breathing shallowly. Despite attempting CPR, paramedics were unable to save him, and he ultimately bled to death. The victim's stab wound was over five inches deep, passing through his stomach and aorta before entering his vertebrae. No knife was recovered from the scene.

An autopsy revealed the victim had several narcotics in his system at the time of death, including methadone and codeine. Opiates, such as these, are depressants that tend to de-energize a person's central nervous system; however, persons suffering from opiate withdrawal can become irritable, aggressive, and argumentative.

Officer Pedroza recognized the victim as someone he had encountered at about 1:30 a.m. on Market Street, close to where he died. At the time, the victim was involved in a loud verbal altercation with his girlfriend, L.W., as well as the security doorman of a nearby strip club. Officer Pedroza and his colleagues investigated the situation, but ultimately found no cause to search or arrest the victim. By the time the officers left the scene, the victim appeared to have calmed down.

During the course of the police investigation into the victim's subsequent death, the officers recovered surveillance videos from several nearby businesses, including three hotels on or near Sixth Street, a pizza restaurant on Sixth Street and the Stop and Go Market near Sixth and Stevenson Alley. Some of these videos showed Stevenson Alley, near to where the victim's body was found, and one of the videos – from Stop and Go Market – showed the victim prior to his death. Specifically, this video showed the victim approach the counter inside the store, light his cigarette, and then leave. As he did so, the victim is seen interacting with defendant, who then followed the victim outside the store.

2

The victim walked toward Stevenson Alley, less than 50 feet from the store, with defendant following behind him.

Video taken from Pranzo Pizza on Sixth Street, in turn, shows the victim walk into the alley. Shortly thereafter, defendant also walks into the alley. Defendant is seen pursuing the victim, who suddenly turns and jumps as if pulling up his pants. At this point, defendant stabs the victim, and then flees.

According to D.J., defendant's 19-year-old girlfriend, the couple were staying at the Vagabond Inn on Ninth Street on the day in question.[2] In the early morning hours, D.J. awoke to find defendant, appearing anxious. He told her that "something happened," an "altercation" on Sixth Street, and that he needed her to dispose of his knife. She agreed, taking the knife from defendant after he wiped it off and disposing of it in the gutter of a nearby alley. Defendant did not give D.J. any specific information that night about what had occurred, and she did not ask for any, although she assumed his statement that, "he got into something," meant he had been attacked. Later, on Facebook, defendant told her he had been attacked.[3]

After D.J. disposed of the knife, she and defendant left the hotel, travelling to Fairfield and Sacramento before taking a bus to Atlanta under assumed names. Two weeks later, however, D.J. returned to the Bay Area without defendant, and was met at the bus station by her mother and the police. D.J. gave a statement to San Francisco Police Inspector Daniel Dedet, admitting to him that she had disposed of defendant's knife. She accompanied the police to the alley at Eighth Street and Ringold Alley where she recalled disposing of the knife, but they could not find it. She also identified from a photograph defendant's jacket, which had been found in Room 18 of the Vagabond Inn. She admitted to police that she had placed the jacket under the bed at defendant's request.

On January 25, 2012, police searched Room 18 of the Vagabond Inn and found a jacket under the box springs of the bed. DNA from this jacket matched defendant's DNA

---

[2]    Defendant was 42 years old when he met D.J.

[3]    D.J. testified under a grant of immunity.

profile. Police then searched the gutter at Eighth Street and Ringold Alley, but could not locate a knife. Other evidence found during the police investigation established that defendant paid cash for bus tickets at the Sacramento Greyhound Station on January 13, 2012.

In late January 2012, Inspector Dedet interviewed defendant upon his return from Atlanta. Defendant denied any knowledge of the victim's stabbing, and denied any involvement in an altercation on Sixth Street in the early morning hours of January 12, 2012.

## II. The Defense Case and Rebuttal.

Nabil Jemai, a taxi driver, testified that, at about 2:20 a.m. on the night in question, he noticed a female on Sixth Street screaming for someone to call 911. Jemai then saw the victim lying on the ground in Stevenson Alley and, thus, called 911. About this time, he saw someone bend over the victim's body and remove the victim's wallet. This person took money from inside the wallet before discarding it. This person's actions were captured on surveillance video and he was later identified and interviewed by police. During the interview, this person acknowledged taking the victim's wallet, but nothing else, from his pockets.

John Rongley, Jr., testified that, while providing security for a Market Street cinema near Sixth Street in the early morning of January 12, 2012, he saw the victim push his girlfriend (L.W.) and yell at her "at the top of his voice." Rongley then saw the victim angrily slap L.W.'s cell phone from her hand, causing it to shatter. Rongley asked the victim to leave the area, as he was impeding business, to which the victim responded: "Fuck you, little bitches. I'll take the God damn walkie-talkie and shove it up your ass." While the victim continued making threatening gestures towards Rongley, a police car drove by and the victim left, walking down Market Street.

Officer Hector Rodarte confirmed the victim was seen in a heated argument with his girlfriend outside the Market Street Cinema at about 1:45 a.m. on January 12, 2012. Other officers had already spoken to the victim by the time Officer Rodarte arrived. His colleague, Officer Pedroza was among the first to respond to the cinema. According to

4

Officer Pedroza, once they separated the victim and his girlfriend, the victim appeared to get "under control," although he remained agitated and talking loudly. Officer Pedroza did not see or hear reports of the victim pushing or hitting his girlfriend and, ultimately, the couple walked away together.

Officer Pedroza and his partner, Officer Frost, found the victim lying in the street about an hour after they encountered him at the cinema. His girlfriend, L.W., was also present. She admitted having a "loaded" syringe in her pocket, and possibly methadone pills. She reported the victim was "detoxified" from heroin use, but had been dropped from a rehabilitation program and had purchased "street methadone" to "keep himself level" without getting high.[4]

Defendant testified in his own defense. He explained that, in January 2012, he and D.J. had been dating five or six months. He found out soon after they began dating that D.J. was a prostitute. Defendant asked her to stop prostituting because he was concerned for her safety, but she told him "she had been doing it before she met [him] and that she understood what she was doing . . . ." Defendant thus "went along with it" and began to help her in order to keep her safe. Specifically, defendant would go with her to jobs to "screen[] the guys that she was dealing with," and D.J. would give him the money she collected, which generally totaled about $400 to $500 per day. Around November 2011, D.J. stopped working. The couple remained together, but their relationship was volatile and they broke up and got back together several times. In January 2012, D.J. accompanied defendant to Atlanta. Although he did not want her to go, he "didn't want to just leave her . . . on the streets."

On January 10, 2012, defendant travelled to San Francisco with D.J. from his home in Fairfield to meet his new granddaughter. They stayed at the Vagabond Inn from January 10 to 12. On January 11, he visited his granddaughter in the afternoon, and then returned to his room. At about 1:00 a.m., he left to buy food and cigars. He went to the

---

[4]     L.W. later told defense counsel that, on January 11, 2012, the victim had injected himself with heroin and given her the empty syringe. L.W. also reported that she and the victim were in a methadone treatment program at the time of his death.

Stop and Go Market and bought ice cream. There, he encountered the victim, blocking the entrance. Defendant told the victim, "excuse me," as he tried to leave the store, and the victim responded by "shouldering" him in the chest. Shocked, defendant said, "What's your problem, man?" The victim said something about a girl, and defendant told him, "Man, just get out of my face." The victim then left the market ahead of defendant without further comment. Defendant likewise left the store, while "continuing to ask him what his problem was because he was still looking at me kind of aggressively. . . . So . . . I was like, 'What is the problem?' " The store owner told them both to get away from the front door.

According to defendant, the victim, from about 10 to 15 feet away, told him, "Come over here and talk to me." Defendant described the victim as "a little agitated," as if defendant had "done something wrong to him." Defendant could tell the victim was high, and thought perhaps the victim had mistaken him for someone else. Defendant "agreed to go a certain distance with him" in order to talk to him to determine what the problem was. As the victim walked further ahead, turning into the alley, defendant "lagged behind" because he did not want to catch up with the victim too fast. Defendant did, however, want to "keep his eyes" on the victim to see what he was up to.

When defendant reached the corner of Sixth Street and Stevenson Alley, the victim told him to "come on back here." Defendant responded, "Man, I'm not going back there with you." Although defendant was ready to leave the situation, the victim took a "fighting stance, like a UFC fighter." Defendant, trying to stay calm, told him, "Man, whatever the problem is, we can talk about it." As defendant later explained, he wanted to resolve any issue there was between them, so that he did not have to worry about a future physical altercation. However, when defendant again asked the victim what his problem was, the victim stated, "I got you now, you Black fuck." The victim was continually moving, making it hard for defendant to focus on what he was doing, After "jumping around" for a few minutes, the victim reached inside his clothing, leading defendant to believe he had reached for a weapon: "So I want to keep my distance from him, but I also want to be close enough to where if he does pull out a weapon, I can

6

defend myself." Defendant then reached into his pocket to place his hand on the knife that he carried with him for protection. And, when the victim took his hands behind his back, defendant took out his knife and stabbed him. While the victim at no point swung at him before the stabbing, defendant was worried because "I couldn't see his hands anymore." Defendant then left the alley, telling bystanders to call 911.

Defendant acknowledged telling D.J. to dispose of his knife and to place the jacket he was wearing under the bed. Defendant explained that he "panicked a little bit." He later spoke to friends and family, who told him to call the police, but he chose not to because he had prior convictions and did not think he would be treated fairly. He left for Atlanta to give himself time to think about what to do, but returned to California 10 or so days later, after D.J., who had already returned due to a conflict between the couple. Upon his return, defendant was interviewed by Inspector Dedet. Defendant denied any involvement in the stabbing because he "didn't know what to say."

On cross-examination, defendant admitted he was depicted in the surveillance video stabbing the victim in Stevenson Alley. Defendant admitted that he stabbed the victim with enough force to penetrate the knife into the victim's back, and that he never saw the victim with a weapon. He also admitted travelling with D.J. to Atlanta under a fictitious name, and slapping D.J. while in Atlanta.

With respect to his initial encounter with the victim, defendant acknowledged his voice could be heard on the surveillance video telling him, "Get the fuck out of my face." The victim did not respond. The video does not reflect defendant saying, "excuse me," to the victim. Defendant did ask him what his problem was and, in response, the victim mentioned something about "my girl." Defendant was acquainted with several people outside the Stop and Go Market that evening. But he was not acquainted with the victim and was not aware of what kind of mood the victim was in or that the victim had been involved in a verbal altercation with his girlfriend earlier in the evening on Market Street. He could tell the victim was high, however, by the look on his face.

Defendant generally carried a knife on a clip in his pocket so that he could easily access it if it became necessary to defend himself. Himself a victim of several past

7

violent assaults, defendant carried the knife for protection instead of a gun because he had a prior arrest for carrying a firearm.  The knife opened with the push of a lever.  On the night in question, defendant pulled out the knife and stabbed the victim in one continuous motion as the victim stood facing him.

### III.  The Verdict, Sentence and Appeal.

On October 16, 2013, a jury convicted defendant of first degree murder in violation of section § 187, subdivision (a).  The jury also found true the enhancement for personal use of a deadly weapon.  Following a sentencing hearing held on March 10, 2014, the trial court imprisoned defendant for 25 years to life, with a consecutive one-year term for the weapons-use enhancement.  This timely appeal followed.

### DISCUSSION

Defendant raises the following claims on appeal:  (1) the prosecutor's excusal for cause of an African-American male prospective juror violated his right to a fair and impartial jury; (2) the trial court's exclusion of evidence relating to the victim's character for violence, and admission of evidence relating to his own prior uncharged criminal conduct, deprived him of the right to a fair trial; (3) the prosecutor's misstatements of fact and law during closing arguments constituted prejudicial misconduct; (4) cumulative errors at trial rendered his trial fundamentally unfair; and (5) his first-degree murder conviction lacked the support of substantial evidence.  We address each issue in turn below.

### I.    The Prosecutor's Use of Peremptory Challenges.

The first issue relates to the trial court's denial of defendant's motion challenging the prosecutor's use of a peremptory challenge to exclude from the jury a prospective African-American juror, hereinafter referred to as "Mr. E."[5]  Although the prosecution accepted Mr. E. on the panel on the first day of voir dire, the prosecutor made a peremptory challenge to Mr. E. on the second day of voir dire after defense counsel made several of his own challenges, which, according to the prosecutor, "changed the

---

[5]     Defendant has not challenged the prosecutor's use of any other peremptory challenge in this appeal.

complexion of the jury." Following the prosecutor's excusal of Mr. E., only one African American prospective juror remained in the jury pool and, once the jury was seated, no African Americans jurors remained. Under these circumstances, defendant contends the excusal of Mr. E violated his right to a fair and impartial jury. The relevant law is not in dispute.

A prosecutor "may exercise a peremptory challenge to excuse a juror for any permissible reason or no reasons at all." (*People v. Huggins* (2006) 38 Cal.4th 175, 227.) However, "use of peremptory challenges to strike prospective jurors on the basis of group bias — that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution" and "the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 541, citing *Batson v. Kentucky* (1986) 476 U.S. 79, 88 [*Batson*]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 ["remov[ing] prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution"] [*Wheeler*].)

When, as here, a defendant challenges the prosecution's use of peremptory strikes by way of a so-called *Wheeler/Batson* motion, he or she must comply with the following procedures. First, the defendant must "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 630, 649.) Second, if the defendant succeeds in making this prima facie case, "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' (*Johnson v. California* (2005) 545 U.S. 162, 168 [162

9

L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.)" (*People v. Williams, supra,* 56 Cal.4th at p. 649; see also *People v. Johnson* (1989) 47 Cal.3d 1194, 1216.)

"The existence or nonexistence of purposeful racial discrimination is a question of fact." (*People v. Lewis* (2008) 43 Cal.4th 415, 469, disapproved on another point in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) As such, on appeal, we must uphold the trial court's denial of a *Wheeler/Batson* motion "if the ruling is fairly supported by substantial evidence in the record, *giving deference to the trial court which had the opportunity to observe . . . the juror.*" (*People v. Holt* (1997) 15 Cal.4th 619, 651; see also *People v. Williams, supra,* 56 Cal.4th at p. 649.) " 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' [Citation.] As long as the court 'makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' [Citation.]" (*People v. Williams, supra,* 56 Cal.4th at p. 650.)

Here, the record reflects the trial court denied defendant's *Wheeler/Batson* motion at the first stage, finding that he failed to make a prima facie showing that the totality of the relevant facts gave rise to an inference of discriminatory purpose. As the California Supreme Court instructs, "Though proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned 'certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic — their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his

alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' (*Wheeler, supra*, 22 Cal.3d at pp. 280-281, fn. omitted; see also *Batson, supra*, 476 U.S. at pp. 96-97 [in assessing a prima facie case, the trial court should consider 'all relevant circumstances,' including 'a "pattern" of strikes against black jurors' and 'the prosecutor's questions and statements during *voir dire* examination']; *U.S. v. Grandison* (D.Md. 1988) 721 F.Supp. 743, 747 [that the prosecutor did not engage in 'desultory or half-hearted questioning' of excused jurors is a factor against prima facie showing]; *United States ex rel. Henderson v. Page* (N.D.Ill. 2000) 2000 WL 1466204, p. *13 ['heterogeneity of the stricken black venire members' is relevant *Batson* circumstance] . . . .)" (*People v. Bell* (2007) 40 Cal.4th 582, 597.)

With these principles in mind, we therefore must decide whether the trial court's ruling in this case, considered in a deferential light, was supported by substantial evidence. (See *id*.; *People v. Williams, supra,* 56 Cal.4th at pp. 649-650.) Having done so, based upon the reasoning set forth below, we find no grounds for disturbing the trial court's denial of defendant's *Batson/Wheeler* motion.[6]

As the record in this case reflects, the prosecutor relied upon the following facts to justify his excusal of Mr. E. from the jury pool. At the start of voir dire, Mr. E. asked the court for a hardship dismissal, but it was denied by the court. According to his questionnaire, Mr. E. claimed hardship because he was an unmarried father of two infant twin children with steady employment in customer relations in the airline industry. In addition, the prosecutor noted that, during voir dire, he asked the entire panel of prospective jurors, including Mr. E., detailed questions on the issue of racial bias: "Is

---

[6]    In fact, as our discussion below will make clear, while the trial court ruled that defendant failed to make the requisite prima facie showing of a discriminatory purpose, the prosecutor nonetheless elected to state for the record his race-neutral justifications for striking Mr. E. from the jury pool. The trial court appears to have considered, and accepted, the prosecution's justifications. (See *People v. Williams, supra,* 56 Cal.4th at p. 650.) Ultimately, however, our affirmance of the trial court's decision is not impacted by the particular nuances of its underlying reasoning, as we agree with the People there is no evidence of purposeful racial discrimination in this case.

11

there anybody here who thinks because [defendant is] African American or a Black man that he must be guilty? That they have some sort of race issue – racism against African Americans? Because that wouldn't be fair, and we don't want you as a juror. [¶] Does everybody understand that? In response to this questioning, Mr. E. expressed no misgivings regarding his ability to fairly discharge his duties as juror.

At the subsequent *Batson/Wheeler* hearing, the prosecution denied having any discriminatory purpose or animus when using one of his peremptory challenges to strike Mr. E. Rather, the prosecutor insisted his decision stemmed primarily from Mr. E.'s hardship questionnaire: "The Court, I'm sure, has observed me asking each and every potential juror who has filled out a questionnaire regarding their ability. And I have been dismissing most of those who filled out hardship requests."

Defense counsel, for his part, pointed out that Mr. E. stated in voir dire that he would not hesitate to convict an African American man of a crime if the evidence proved him guilty, and that his hardship concerns would not prevent him from being a fair juror. Defense counsel also noted there were seated jurors who, like Mr. E., were employed with young children. The prosecutor responded that these other seated jurors, unlike Mr. E., were married.

After hearing from counsel, the trial court denied defendant's *Batson/Wheeler* motion, emphasizing that no prima facie showing had been made that Mr. E. was excused from the jury pool for any impermissible reason. The trial court then added that, "[u]nfortunately, . . . we have few African-Americans on our jury panels, in this case we have had only five in our total venire. Three actually made it to the box of twenty-four. Two were excused for cause. [¶] Before the challenge was made one was excused for cause, two remained. And the [District Attorney] excused one, leaving another . . . person of African descent in the first group of twelve. And two additional people in the audience, one of which then made it to the panel but was excused for cause again."

Having considered this record as a whole and in a deferential light, we conclude substantial evidence supports the trial court's finding that no reasonable inference was raised that the prosecutor acted for other than a race-neutral purpose. First, as the trial

12

court noted, "as a practical matter the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion." (*People v. Bell, supra*, 40 Cal.4th at p. 597-598 [explaining that, "While the prosecutor did excuse two out of three members of this group [of African American women], [fn. omitted] the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible"].)[7] Here, the prosecutor had already exercised eight peremptory challenges up to that point, none of which were directed at African American prospective jurors. Yet, on appeal, defendant challenges only the prosecutor's decision to strike Mr. E., a circumstance weighing against finding the existence of any pattern of striking prospective jurors on the basis of group bias.[8]

Second, as we previously stated, a defendant's prima facie showing may be "supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all." (*People v. Bell, supra*, 40 Cal.4th at p. 597.) In this case, quite to the contrary, the prosecutor asked very direct and poignant questions regarding the jurors' ability to fairly discharge their duties in a race-neutral manner, a circumstance adding further support for the trial court's finding.

---

[7]     As the California Supreme Court was quick to note, while "circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case, including this one, to make a prima facie case after the excusal of only one or two members of a group is very difficult. (*People v. Bell, supra*, 40 Cal.4th at p. 598, fn. 3.)

[8]     Defendant points out that, just before the prosecutor's challenge of Mr. E., the prosecutor exercised a peremptory challenge against a juror who, although not herself African American, was married to and shared two children with an African American male. However, as reflected in our discussion from above, defendant did not challenge the prosecutor's use of a peremptory challenge in this instance. Moreover, the record reflects the prosecutor questioned this female prospective juror extensively during voir dire regarding the fact that she served as one of the Mayor's senior advisors and had quite strong opinions regarding San Francisco crime and, more generally, our criminal justice system, providing a legitimate non-discriminatory basis for the prosecutor's decision to strike her from the jury pool.

13

Finally, even were we to assume for the sake of argument that a prima facie showing was made, we would nonetheless conclude on the totality of this record that the prosecutor's stated reason for using a peremptory challenge to strike Mr. E. from the panel – to wit, his hardship concerns arising from the fact that he was an unmarried father to two infant children with steady employment in the airline industry – was permissibly race-neutral. As the prosecutor explained, he struck several potential jurors on the basis of their hardship concerns, including those of other races or ethnicities. Defendant directs us to nothing in the record that would undermine the prosecutor's race-neutral explanation. Rather, he points out that the prosecutor did not exercise peremptory challenges in at least three other instances where the prospective juror was employed with children. However, as the People counter, in each of these instances, the prospective juror was married with one or more older children, circumstances distinguishing these other individuals from Mr. E.

Thus, because the prosecutor's stated reason for excusing Mr. E. was legitimate under the law and adequately supported by the record, we conclude the trial court properly denied defendant's *Batson/Wheeler* motion. (See *Purkett v. Elem* (1995) 514 U.S. 765, 769 ["What it means by a 'legitimate reason' [to challenge a juror] is not a reason that makes sense, but a reason that does not deny equal protection"]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1101-1102, overruled on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151 [affirming trial court's finding of no *Batson/Wheeler* error where "the record reveals reasons other than racial discrimination for [a] prosecutor to challenge this prospective juror"].) Accordingly, no grounds for reversal exist under *Batson/Wheeler* in this case.

## II.    Exclusion of Evidence Relating to the Victim's Bad Character.

Defendant also challenges the trial court's refusal to admit evidence relating to the victim's propensity for violence as prejudicial error that deprived him of his constitutional right to present a complete defense. Specifically, the challenged ruling excluded from trial evidence that, within two years of the charged offense, the victim was twice convicted in New York of misdemeanor weapon possession and, in 2010, appeared

14

in a reality television program called "Intervention," relating to his then-girlfriend's drug addiction, in which he stated that he intended to buy a knife for protection after recently being released from prison.[9] At the same time, the trial court admitted other evidence relating to the victim's prior conviction in New York for making "terroristic threats." The following legal principles apply to this challenge.

Generally, all relevant evidence is admissible. (*People v. Champion* (1995) 9 Cal.4th 879, 922.) Relevant evidence is that which has any tendency in reason to prove or disprove any disputed fact material to the outcome of the case. (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]' [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.) Moreover, even relevant evidence may nonetheless be excluded if the trial court finds that its probative value is substantially outweighed by its prejudicial effect. (*People v. Champion, supra,* 9 Cal.4th at p. 922; Evid. Code, § 352.)

In this case, defendant insists the excluded evidence was admissible under Evidence Code section 1103, subdivision (a) (hereinafter, section 1103(a)). This provision permits admission of evidence of the victim's character if the evidence is "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (§ 1103, subd. (a).) As defendant notes: " 'It has long been recognized that where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible.' [Citations.] Under [section 1103], such character traits can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence. [Citation.]" (*People v. Wright* (1985) 39 Cal.3d 576, 587.) Moreover, because a defendant claiming self-defense must prove his subjective frame of mind, he is "entitled to corroborate his testimony that he

_____

[9] The trial court described one of the victim's misdemeanor offenses as involving possession of a "sharpened wooden rod."

15

was in fear for his life by proving the reasonableness of such fear." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065-1066.) A defendant may thus offer corroborating evidence demonstrating the victim's character for violence in order to strengthen his own credibility in the eyes of the jury. (*Ibid*, citing *People v. Davis* (1965) 63 Cal.2d 648, 656.)

However, consistent with these general rules, even if the evidence is admissible under section 1103(a), the trial court must still determine, pursuant to Evidence Code section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial risk of undue prejudice, confusion of issues, or mislead the jury. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 ["a defendant's evidence of self-defense is subject to all the normal evidentiary rules," including Evidence Code section 352].) The trial court has broad discretion when making this determination, and we will not disturb the court's exercise of discretion on appeal absent a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193; *Korsak v. Atlas Hotels, Inc*. (1992) 2 Cal.App.4th 1516, 1522-1523.)

Having considered this record, we find nothing arbitrary, capricious, or patently absurd about the trial court's decision to exclude the challenged evidence relating to the victim's violent character, including evidence that the victim had twice been convicted of weapon possession within two years of the charged offense, and had stated on television his desire to purchase a knife to replace one he had lost while incarcerated. "The law recognizes the well-established fact in human experience that the *known reputation* of an assailant as to violence, even if specific acts are not within the knowledge of a person assaulted, has a material bearing on the degree and nature of apprehension of danger on the part of the person assaulted . . . ." (*People v. Smith* (1967) 249 Cal.App.2d 395, 404 [italics added].) Here, however, we question the probative value of the proffered evidence in demonstrating defendant could have actually and reasonably believed the victim had a weapon given the absence of any evidence defendant was aware of the

victim's purported character or reputation for carrying weapons or engaging in violence. (See *People v. Thomas* (1969) 269 Cal.App.2d 327, 329 [affirming exclusion of character evidence in the absence of any showing the defendant knew of the victim's prior violent acts].) To the contrary, the record reflects defendant met the victim for the first time on the night in question when they briefly exchanged words at a convenience store. As such, there is no basis for finding (and defendant does not claim) that, at the time of the stabbing, he knew about the victim's reputation for violence, much less that the victim had prior convictions for misdemeanor weapon possession.

Even more telling, there is no evidence in this record that the victim possessed a weapon at any time prior to or during the stabbing. Defendant, for his part, acknowledged that he never saw the victim in possession of a knife or other weapon. Moreover, the surveillance video that captured the stabbing contains no image of a knife or other weapon in the victim's possession. Nor was any knife or weapon recovered from the victim's body or the scene of his death. While defendant notes that a third party was seen emptying the victim's pockets before the police found his body, it is mere speculation to assume this third party emptied the victim's pockets of a weapon, particularly where the surveillance video suggests otherwise.[10]

Finally, and more generally, the proferred evidence at most supports an inference that the victim had a habit of carrying a knife. However, such evidence of habitually carrying a weapon does not, without more, prove the victim was actually a violent person, such that an inference could be made that he was likely to have threatened violence towards defendant in the minutes leading up to the stabbing, as defendant suggests. For example, there was no evidence proffered or admitted that the victim actually used a knife to threaten or harm another person. And, the evidence that defendant had, in the past, made "terroristic threats" was admitted by the trial court, along with a wealth of evidence relating to the victim's loud and aggressive verbal altercation with his girlfriend on Market Street just an hour before his death.

---

[10] During his subsequent police interview, this third party denied taking anything from the victim other than money.

17

Under these circumstances, we conclude the trial court could have reasonably found the minimally-probative evidence that the victim had been convicted twice in the recent past of weapon possession would have consumed an undue amount of time, while possibly distracting and confusing jurors. As stated above, trial courts have broad discretion to exclude evidence when its probative value is outweighed by the probability its admission would necessitate the undue consumption of time, confuse the issues, or mislead the jury. And here, the trial court's exercise of discretion was appropriate. (See *People v. Mills* (2010) 48 Cal.4th 158, 195 [no abuse of discretion to exclude evidence of the victim's boyfriend's violent character on the issue of identity where the minimal probative value of the evidence "was 'substantially outweighed by the collateralness of it all and the time [required to present it]' "].)

Finally, in affirming the trial court's exclusion of this character evidence, we reject defendant's argument that the court's ruling implicated his constitutional right to present a complete defense. " 'Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor ([citations]) . . . "the proffered evidence must have more than 'slight-relevancy' to the issues presented." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 865.) And, while defendant may be correct that his subjective belief in the need for self defense was the issue at the heart of his case, the law is quite clear that "this does not mean the trial court constitutionally was compelled to permit [him] to introduce all possibly relevant evidence on these subjects despite its marginal relevance, the possible effect upon the jury's ability to remain focused on the issues before it (rather than becoming sidetracked on collateral questions), and the potentially significant amount of time entailed in admitting the evidence in a manner fair to both sides. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 82 [33 Cal.Rptr.3d 1, 117 P.3d 622] ['a state court's application of ordinary rules of evidence — including the rule stated in Evidence Code section 352 — generally does not infringe upon' the constitutional right to offer a defense] . . . .)" (*People v. Fuiava* (2012) 53 Cal.4th 622, 665-666.)

18

Accordingly, we conclude that exclusion of the challenged evidence relating to the victim's violent character was within the proper scope of the trial court's broad discretion under Evidence Code section 352, and resulted in no infringement on defendant's right to present a complete defense.

## III.     Admission of Evidence of Defendant's Prior Bad Acts.

Defendant next challenges the trial court's admission of evidence relating to his own criminal disposition.  According to defendant, evidence of his prior bad acts was irrelevant and unduly inflammatory, such that the trial court should have excluded it pursuant to Evidence Code section 352.  The rules governing our review of a challenge to a trial court's evidentiary ruling have already been set forth.  (E.g., *People v. Smith* (2003) 30 Cal.4th 581, 612 ["determination of relevance and undue prejudice lies within the discretion of the trial court, and a reviewing court reviews that determination for abuse of discretion"].)

In this case, the trial court admitted the challenged evidence of defendant's prior uncharged bad acts pursuant to Evidence Code section 1103, subdivision (b) (hereinafter, section 1103(b)).  As explained by the California Supreme Court, " 'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.] 'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. [Citation.] When reviewing the admission of evidence of other offenses, a court must consider:  (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule

19

or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]' [Citation.]" (*People v. Fuiava, supra,* 53 Cal.4th at p. 667.)

Applying these principles to the relevant record, we find no basis for disturbing the trial court's ruling to admit the challenged evidence. As the record reflects, when defendant moved *in limine* to exclude this evidence, the trial court stated it would not be admissible in the prosecution's case-in-chief, but could come in on rebuttal for the purpose of impeaching defendant or responding to any testimony offered by him to impugn the victim's character. Subsequently, the trial court allowed the evidence for the purpose of impeaching defendant, after he took the stand in his own defense. We conclude this decision was a proper exercise of discretion.

Specifically, defendant testified at length about the victim's allegedly threatening behavior towards him, which, he claimed, let him to believe it was necessary to stab the victim in self defense. In addition, defendant offered evidence of the victim's own prior bad acts, including the victim's conviction in New York for making "terroristic threats" and his verbal altercation with his girlfriend just an hour before the stabbing that required police intervention. Under these circumstances, the trial court could have reasonably found that the evidence of defendant's prior uncharged acts (to wit, pimping and domestic violence) was relevant to impeach his testimony that he innocently followed the victim into the alleyway in the hopes of resolving whatever problems had arisen between them, and only resorted to violence when he believed it was necessary to protect his own life, and that such evidence would not be unduly prejudicial. (See *People v. Karis* (1988) 46 Cal.3d 612, 638 [" 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging" ' "].) As stated in a well-known legal treatise: "Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach the

20

witness, subject to the trial court's discretion under [Evidence Code section 352]." (3 Witkin, Cal. Evid. (5th ed. 2012) Presentation § 326, p. 459, citing *People v. Wheeler* (1992) 4 Cal.4th 284, 288, 295.)

And finally, given the circumstances of this case, we conclude any error in admitting this evidence was, in any event, harmless. Substantial evidence, including defendant's own testimony, established that he stabbed the victim. And, as discussed at length above, while defendant insisted he acted in self-defense, there was no evidence aside from his own testimony that the victim threatened him (much less attacked him). Moreover, the surveillance video that captured the stabbing reflected otherwise – to wit, that defendant, unprovoked, approached the victim from behind in a dark alley and stabbed him in the heart with enough force to penetrate his vertebrae. Adding to this record, there was other, unchallenged evidence relating to defendant's bad character, including his own testimony that he had previously pimped for D.J., and had physically harmed her at least once by slapping her. As such, it is not reasonably probable the verdict would have been more favorable to defendant had the court not admitted the evidence of defendant's prior acts of pimping and domestic violence. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162-1163, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) The trial court's decision in this regard thus stands.

## IV. The Prosecutor's Remarks during Closing Arguments.

Defendant's next contention is that the prosecutor engaged in prejudicial misconduct during closing arguments by making certain misstatements of law or fact to the jury. Specifically, the defendant identifies the following three lines of argument during which the prosecutor improperly misspoke:

"And until you have evidence, [defendant] was presumed innocent. He was presumed innocent until you have evidence to the contrary. [¶] Well, now you have evidence to the contrary. And there's no self-defense. This guy's pursuing him and killing him."

"If [defendant] asks somebody to get rid of evidence. If he tried himself to get rid of evidence, this is proof of a consciousness of guilt, knowing that he's guilty. [¶] It's

21

not circumstantial evidence; it's direct evidence. He lied. He tried to get rid of the evidence. And [D.J.] brought it to the police; told the police where it was."

"[Defendant] is a guy who is taking the money from an 18-year-old prostitute and beating her up when she doesn't bring home enough dough."

The law governing defendant's prosecutorial misconduct claims is not in dispute. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*). See also *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [federal Constitution violated where prosecutorial misconduct is "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process"].) Under these standards, " ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]' . . . 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819, disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) When the alleged prosecutorial misconduct stems from the prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.)

Turning now to defendant's first claim relating to the prosecutor's comments regarding the presumption of innocence, he insists the prosecutor improperly suggested to the jury that, in his case, this legal presumption ended before the end of trial, which, according to defendant, is "a clear misstatement of long-established law." We find no such impropriety.

22

Specifically, while we agree with defendant that the presumption of innocence is a core component of our criminal justice system (*Estelle v. Williams* (1976) 425 U.S. 501, 503), and that "the presumption of innocence continues not only during the taking of the testimony, but during the deliberations of the jury and until they reach a verdict" (*People v. Arlington* (1900) 131 Cal. 231, 235), we disagree that these principles were undermined in his case. Rather, the prosecutor's argument that, in effect, the "presumption of innocence" had ended because "you have evidence to the contrary" was made in the course of the prosecutor's broader argument that the evidence, considered as a whole, sufficed to prove defendant's guilt beyond a reasonable doubt. The prosecutor also made clear, to be sure, that "everything that I say, as we've heard a million times, is not evidence. It's what the witnesses and documents and videos show that is the evidence." He also reminded that each juror had a duty to apply the law as provided by the trial court. Thus, the prosecutor's comments, viewed as a whole, did not misstate the law. Rather, they reflected the prosecution's views as to what the evidence established. As the California Supreme Court has explained, "[a prosecutor] has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283; *People v. Panah* (2005) 35 Cal.4th 395, 463 [*Panah*] [finding nothing improper in the prosecutor's statement in closing arguments that the prosecution's evidence had "stripped away" the defendant's presumption of innocence]. Cf. *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1407-1408 [noting that, while the prosecutor's initial comment that the "presumption of innocence is over," prefaced by a reference to the overwhelming evidence of guilt, was arguably permissible under *Panah*, the prosecutor subsequently committed misconduct when "[he] repeated the misstatement, together with the assertions that it was 'fairly obvious' [defendant] was guilty, and most critically, '*He has gotten his fair trial*' "].)

Moreover, consistent with the prosecutor's overall argument, the trial court clearly instructed the jury that defendant, like all criminal defendants, must be presumed innocent unless or until the prosecution proves him guilty beyond a reasonable doubt, and that nothing the attorneys say is evidence. We, as always, presume the jury followed

23

these instructions.  (*People v. Goldberg* (1984) 161 Cal.App.3d 170, 189-190 ["Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they*, as the fact-finding body, conclude guilt was proven beyond a reasonable doubt"], accord *People v. Delgado* (1993) 5 Cal.4th 312, 331.)  Thus, even assuming for the sake of argument the prosecutor's remark could be deemed improper, on this record, we are confident there was no reasonable likelihood "the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.)  Defendant's first prosecutorial misconduct claim thus fails.

Defendant's second such claim is that the prosecutor misstated the law by telling jurors that defendant's efforts to dispose of the murder weapon constituted "direct evidence" of his guilt.  (See *People v. Geier* (2007) 41 Cal.4th 555, 588 [a defendant's conduct indicating consciousness of guilt "is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for [the jury's] determination"].)  However, as the law set forth above makes clear, prosecutorial misconduct must rise to the level of reprehensibility or deception to warrant reversal on appeal.  (*People v. Hill* (1998) 17 Cal.4th 800, 822-823.)  Here, on this record, we find no such reprehensibility or deception.  In particular, there is no basis for assuming the prosecutor acted other than in good faith when he misspoke with respect to the concepts of direct and circumstantial evidence.  We hasten to add that the prosecutor himself warned the jury that his comments in closing arguments did not constitute evidence in the case, and that it must follow the trial court's instructions regarding the applicable law.  Thereafter, the jury was given multiple instructions by the trial court regarding the legal concepts of direct evidence and circumstantial evidence, including that, while both types of evidence are acceptable and of equal weight, "[d]irect evidence can prove a fact by itself," while "[c]ircumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact . . . from which you may logically and reasonably conclude the truth of the fact in question." (See CALCRIM No. 223.)  Under these circumstances, there is no basis to conclude the prosecutor was attempting to deceive the court or the jury when

24

arguing that evidence that defendant sought to dispose of the murder weapon was direct evidence of his guilt. As such, no grounds exist for reversal on the basis of the prosecutor's error.

We reach the same conclusion with respect to defendant's remaining prosecutorial misconduct claim – to wit, that the prosecutor misstated the facts when arguing defendant had hit D.J. for not earning enough money as a prostitute. Defendant is correct that he responded, "No," when asked at trial whether he in fact did this. Defendant is likewise correct that, generally, it is prosecutorial misconduct to refer in closing arguments to any "matter outside the record." (*People v. Pinholster* (1992) 1 Cal.4th 865, 948, overruled on another point in *People v. Williams* (2010) 49 Cal.4th 405, 459.) However, as we just finished explaining, prosecutorial misconduct must rise to the level of reprehensibility or deception to warrant reversal on appeal. (*People v. Hill, supra,* 17 Cal.4th at pp. 822-823.) Here, again, we can find no such reprehensibility or deception. Rather, it appears the prosecutor genuinely believed defendant's testimony was as he described it. Indeed, the prosecutor, in response to defense counsel's objection, assured the trial court that, when asked in cross-examination whether he hit D.J. for not making enough money, defendant answered in the affirmative. As defendant acknowledges, the trial court then agreed with the prosecutor that defendant's testimony was as described by the prosecutor. Under these circumstances, there is no basis to conclude the prosecutor was attempting to deceive the court or the jury when arguing that defendant admitted hitting D.J. for failing to "bring home enough dough." And, to the extent the jury may have been confused over this issue, both attorneys and the court repeatedly advised that "[n]othing that the attorneys say is evidence. . . . Only the witnesses' answers are evidence." As such, no grounds exist on this record for reversal on the basis of this prosecutorial mistake. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1233-1234 [no prejudicial prosecutorial

misconduct was established where the prosecutor had a good faith, yet mistaken, belief that a factual basis existed for his insinuations to an adverse witness on the stand].)[11]

## V.    Cumulative Error.

Defendant next claims the cumulative effect of the identified errors at trial was to deprive him of his right to due process under the federal Constitution. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." ( *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32; see also *People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

We reject this argument. As we have discussed at length above, there were few errors made at trial, and no prejudicial error requiring reversal. And, as the California Supreme Court as stated, "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill, supra,* 17 Cal.4th at p. 844.) Here, even assuming defendant's trial was less than perfect, the requisite showing of injustice was not made. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 ["The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial' "].) Accordingly, the cumulative error doctrine provides no basis for reversal on appeal.

## VI.    Substantiality of Evidence of Guilt for First Degree Murder.

Defendant's final argument is that the evidence was insufficient to support his conviction for first degree murder. Defendant reasons there was no evidence in the record he premeditated or deliberated before stabbing the victim. We disagree.

" 'To determine [the validity of a claim of insufficient] evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could

---

[11]    Because we have opted to address the merits of defendant's prosecutorial misconduct claims, we need not address his related argument that he was denied effective assistance of counsel due to his attorney's failure to properly preserve these claims for review on appeal.

reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole. [Citations.]' [Citation.] If we determine that a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of article I, section 15 of the California Constitution. [Citation.]' " (*People v. Memro* (1995) 11 Cal.4th 786, 861.)

More specifically, where, as here, the charge is first degree murder, a jury is entitled to find the defendant committed premeditated and deliberate murder where there is evidence the defendant inflicted fatal force upon the victim while acting with intent to cause death after sufficient time, no matter how brief, to reflect on the consequences of his behavior. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 ["[p]remeditation and deliberation . . . can occur in a brief interval: ' " '[t]he test is not time, but reflection,' " ' as ' " '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly' " ' "]; see also 40A Am.Jur.2d, Homicide, § 251, p. 92 ["Deaths caused in the following manner are sufficient to infer the specific intent required for a conviction of murder: [¶] . . . [¶] the use of a deadly weapon upon a vital part of the victim's body"; fn. omitted].)

Here, we conclude the substantial evidence standard has been met. In particular, the record reflects, first, that defendant perceived the victim had insulted or somehow disrespected him when he blocked the entrance to the Stop and Go Market and then "shoulder[ed]" defendant in the chest as defendant tried to leave. In addition, there was evidence in the form of surveillance video that, after the victim left the store without making further comment to defendant, defendant followed the victim for about 46 feet from a slight distance away as the victim walked down the alleyway. Then, as the video further reflects, defendant approached the victim from behind and stabbed him so ferociously with his knife that, in one continuous motion, he pierced the victim's aorta and penetrated five inches deep, reaching his spine. Finally, as defendant himself admitted, he routinely carried this knife in a clip in his pocket so that he could easily

27

retrieve and use the knife should it become necessary. Here, however, not only was the victim unarmed, he at no point swung at defendant prior to being stabbed. This evidence, viewed collectively, sufficed to support the jury's finding of first degree murder. (See *People v. Memro, supra*, 11 Cal.4th at p. 863 [upholding a finding of premeditated murder where the defendant pursued the victim on foot before cutting his throat]; *People v. Bolden* (2002) 29 Cal.4th 515, 560-561 ["defendant could have had no other intent than to kill" where he "plunged" the knife five to six inches deep into the victim's back and where there was no evidence of a struggle or quarrel at the scene]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114-1115 ["Defendant argues there is no evidence of a specific intent to kill, highlighting his testimony that he intended to stab but not kill the victim. However, defendant stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable part of the body. . . . While a less violent attack might have been consistent with the claim of an intent to stab but not to kill, this was not such an attack"].)

The jury's verdict thus stands.

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.

*People v. Charles Robertson*, A141587

28